UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONNIE M. DAVIS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>NIH FEDERAL CREDIT UNION, et al.,<br><br>　　　　　Defendants. | Case No.  12-cv-05502-JCS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**Dkt. No. 51.** |

## I.    INTRODUCTION

In this diversity action, Plaintiff Connie M. Davis ("Plaintiff") asserts one cause of action arising under California Labor Code § 970 against her former employer, NIH Federal Credit Union ("NIHFCU"), and Juli Anne Callis ("Callis"), the Chief Executive Officer of NIHFCU at the time of Plaintiff's employment (collectively, "Defendants").  Plaintiff contends that Defendants violated § 970 of the California Labor Code, which prohibits employers from making knowingly false statements regarding the kind, character or length of employment to persuade a someone to move out of state.  Defendants filed a Motion for Summary Judgment ("Motion").  The Court held a hearing on the Motion on February 21, 2014.  For the reasons set forth below, the Motion is GRANTED in part and DENIED in part.[1]

## II.    BACKGROUND

### A.    Undisputed Facts re Plaintiff's Offer and Acceptance of a Position at NIHFCU

Plaintiff is a resident of California and has worked in the financial services industry for almost thirty years.  Dkt. No. 52 (Joint Statement of Undisputed Facts) ("JSUF") ¶¶ 1-2.  Plaintiff

---

[1] The parties have consented to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

met Defendant Callis in December 2008, when Plaintiff interviewed for a vice president position at Keypoint Credit Union in Santa Clara, California.  JSUF ¶ 7.  At the time, Callis was the Chief Operating Officer at Keypoint Credit Union.  *Id*. ¶ 8.  Callis hired Plaintiff for the vice president position in January 2009.  *Id*. ¶ 9.  One of Plaintiff's accomplishments during her time at Keypoint Credit Union was to successfully install an international remittance product.  JSUF ¶ 10.

Two months after Plaintiff started working at Keypoint Credit Union, Callis left to take the position of Chief Executive Officer ("CEO") at NIHFCU.  Davis Decl. ¶ 5.  Defendant NIHFCU is a half-billion dollar federal credit union located in Rockville, Maryland.  *Id*. ¶¶ 3-4.

Two days after Callis left Keypoint Credit Union, Plaintiff was laid off.  *See* JSUF ¶ 20.  The CEO of Keypoint Credit Union was not interested in doing what Callis hired Plaintiff to do.  *Id*.  Plaintiff did not believe this was the fault of Callis.  *See id.*

Defendant Callis and Plaintiff kept in contact from time to time after their employment together at Keypoint Credit Union, primarily via email to share their Christian faith.  JSUF ¶ 11.  Callis is married to a Baptist minister.  *Id*. ¶ 12.

In approximately July 2010, Defendant Callis contacted Plaintiff to ask if she was available to come to Maryland to install the same international remittance product that Plaintiff had successfully installed at Keypoint Credit Union.  JSUF ¶ 13.  In July 2010, Plaintiff was employed fulltime by the University of California, but was able to use a week of her accrued vacation time to fly to Maryland to install and implement the international remittance product at NIHFCU.  *Id*. ¶ 14.

On November 28, 2010, Defendant Callis emailed Plaintiff: "How r u doing?  Shampa is going to India etc and resigned.  Wish u were near us.  Blessings in all u do … Jac."  JSUF ¶ 15.  Shampa had been managing account operations at NIHFCU.  Plaintiff responded to Defendant Callis by email that same day, reporting how she was doing generally and stating, "I have 10 more comp days, so if you need help setting up cash management let me know.  I could come after the new year."  *Id*. ¶ 16.

Defendant Callis responded to Plaintiff's email the following day: "Would you ever consider a relo for the right position?  Or bi coastal work arrangement as a member of Senior

2

United States District Court
Northern District of California

Management?"  On November 29, 2010, Defendant Callis wrote Plaintiff:

> Would you like to give me more information on your thoughts? …
> [I]f you are seriously considering an option that would mean either
> on contract or as an employee you would join the team.  … I would
> prefer a fully engaged team member that would actually become a
> senior staff member… If not I will start the search with head hunters
> when I return.  Let me know where you really are on this as it will
> not remain open for a long period of time.

JUSF ¶ 17.

On November 30, 2010, Plaintiff emailed Defendant Callis writing that she was interested

in coming on board, but that she would "want a commitment from the CU so what happened at

Keypoint doesn't happen again."  Plaintiff wrote, "You have no idea how difficult that was."  *Id*. ¶

18.  Defendant Callis responded, "Great I am out of the country but my deputy is Tim Duvall

please proceed by working with him immediately."[2]  *Id*. ¶ 19.

Over the next couple of days, Plaintiff and Tim Duvall, the newly appointed Deputy CEO

at NIHFCU, emailed one another about the position.  JSUF ¶ 20.  In an email to Tim Duvall dated

December 2, 2010, Plaintiff wrote:

> 1. I'm not interested in a contract position.  I have a good job that
> will last a year or more, and UCB told me today that they will find
> me a new position if mine is moved to South Dakota as is being
> planned, so I'm not going to be laid off as I assumed.

---

[2] In her deposition, Callis denied contacting Plaintiff to offer her the position:
Q: Sometime in late July 2010, you contacted [Plaintiff] to come to
work at NIHFCU.  Is that correct?
A: I did not contact Connie to come work at NIHFCU.
Q: Well, at some point, a conversation emerged between you about
Connie working at the NIHFCU.  Is that correct?
A: Numerous discussions happened about a position that was open
she applied for with others.
Q: When were these conversations?
A: During the course of the open position recruitment process with
HR.
Q: And how did Ms. Davis become aware that that position was
open at NIHFCU?
A: I have no idea….
Callis Depo. at 43:1-23.

3

2. I'm interested in a senior management position, preferably as the COO if that is a possibility.  I've managed everything from customer service to operations, HR to IT.

3. We discussed a bi-coastal work arrangement as she knows I have children, one who is disabled, and moving him to Maryland would be very, very difficult…

4. We didn't discuss salary, but my current base is 130,000 plus a 25% bonus…

5. I will want some kind of commitment from the CU that they aren't going to hire me and lay me off in 6 months. That is what happened when I went to Keypoint in CA.  It wasn't Juli Anne's fault.  The CEO laid me off two days after she left as he wasn't interested in doing what Juli Anne hired me to do.  I am not going to go through that again.

JUSF ¶ 20.

In November 2010, Plaintiff was employed with the University of California, where she earned $130,000 plus full benefits, including health, vision and dental insurance, a contributory 401k plan, and vacation and sick leave.  *Id*. ¶ 31.  Prior to learning about the position at NIHFCU, Plaintiff had not been seeking other employment.  *Id*. ¶ 39.  Plaintiff owned a home in Concord, California, where two of her adult sons lived with her.  *Id*. ¶ 32.  Plaintiff had lived in the San Francisco Bay Area over twenty-five years and had her professional network and religious community there.  *Id*. ¶ 33.  Plaintiff's parents also reside near the Bay Area.  *Id*. ¶ 34.

Additional discussions took place between Callis and Plaintiff during December 2010 and January 2011, the content of which is disputed.  Plaintiff alleges that Callis made three knowingly false statements to persuade her to accept the position with NIHFCU and move to Maryland: (1) that Plaintiff was hired to build a Cash Management Division at NIHFCU; (2) that Callis would be Plaintiff's supervisor; (2) that Plaintiff's employment would be a "long-term permanent job."  JSUF ¶ 134.  Although Plaintiff had not been seeking other employment, Plaintiff was interested in the job at NIHFCU that Defendant Callis' represented to her.  JSUF ¶ 39.

In early February 2011, Plaintiff flew to Maryland and interviewed at NIHFCU.  JSUF ¶ 40.  Shortly after Plaintiff returned to California from the interview, Callis called Plaintiff and informed her that all of the senior managers wanted her join the NIHFCU staff.  *Id*. ¶ 42.  Plaintiff

4

1    was offered the position of Vice President of Cash Management and Account Operations. *Id*. ¶¶

2    42, 48. Defendant Callis offered Plaintiff a starting salary of $150,000 and an implied 20% bonus,

3    which was approximately $50,000 more than Plaintiff was making at the University. *Id*. ¶ 46.

4        Plaintiff received a written offer dated February 7, 2011. JSUF ¶ 47; *see also* Brown

5    Decl., Ex. G. The letter confirmed the compensation terms described above. *See id*. One

6    sentence in the first paragraph of the letter also states: "Juli Anne Callis will be your supervisor."

7    *Id*. The last paragraph states: "[T]his letter or its contents are not intended to be and should not be

8    construed as being a contract for employment under any terms or conditions." *Id*. Plaintiff signed

9    the offer letter on February 28, 2011, which was her first day of employment at NIHFCU. *Id*. ¶

10   58.

11       Plaintiff's job description states that her title is "Vice President Cash Management and

12   Account Operations." Brown Decl., Ex. I. In the "Job Summary" section of the job description,

13   the following is written under the prompt asking for "a brief description of the overall purpose of

14   this position":

15           Involves creating a new Cash Management Division and upgrading
             and modifying the existing Account Operations Division.
16           Responsible for establishing the goals and objectives for both teams
             and taking the necessary steps to create responsive and efficient
17           operations to exceed the corporate vision for these areas. General
             management includes long and short range strategic planning in
18           determining the mission and directing all activities of multi-
             disciplinary departments through subordinate management staff.
19

20   JSUF ¶ 61; Brown Decl., Ex. I. In the "Key Responsibilities" section of the job description, it

21   states that the position "[w]orks direction with the CEO and Deputy CEO to improve cross

22   functional work flows and controls to optimize productivity." *Id*.

23       Plaintiff did not build a Cash Management Division during her time at NIHFCU. Plaintiff

24   states that, within the first week of working at NIHFCU, Callis told Plaintiff that NIHFCU would

25   not be going forward with the creation of a Cash Management Division. Davis Decl. ¶ 24.

26   Plaintiff also states that, three months into her job at NIHFCU, Callis informed her that she no

27   longer report to Callis and would only report to Duvall. JSUF ¶ 113; Davis Depo. at 42. These

28   facts are disputed and discussed further below. Defendants deny that Callis ever told Plaintiff that

5

1    NIHFCU no longer intended to build a Cash Management Division, or that Callis ever told

2    Plaintiff to report only to Duvall.  Defendants contend that due to economic circumstances, the

3    creation of the Cash Management Division merely ceased to be a priority after Plaintiff started

4    working there.

5        On July 15, 2011, Tim Duvall called Plaintiff into his office and told Plaintiff that she was

6    being terminated.  JSUF ¶ 119.  The decision to terminate Plaintiff was made by both Callis and

7    Duvall.  *Id.* ¶ 120.  Plaintiff stayed in Maryland and lived in the townhouse for which she had

8    signed a one-year lease.  *Id.*  Plaintiff ultimately collected unemployment benefits from both the

9    State of Maryland and the State of California.  *Id.*

10       **B.    Evidence Relating to Callis's Three Alleged Misrepresentations to Plaintiff**

11       This case turns on whether Callis knowingly made false statements to persuade Plaintiff to

12   accept the position with NIHFCU and move to Maryland.  Plaintiff states that Callis is the only

13   employee of NIHFCU that made any false representations.  Davis Depo. at 152.  Section 970 of

14   the California Labor Code prohibits employers from making knowingly false statements regarding

15   the kind, character or length of employment to induce a California resident to move out of state.

16   *See* Cal. Labor Code § 970.  As noted above, Plaintiff claims that Callis knowingly made three

17   false statements in order to persuade Plaintiff to accept the position at NIHFCU and move to

18   Maryland: (1) that Plaintiff was being hired to build a cash management division; (2) that Callis

19   would be Plaintiff's supervisor; and (3) that Plaintiff was being hired for long term employment.

20   *See* JSUF ¶ 134; Davis Decl. ¶¶ 18-19.

21       **1.    *"Plaintiff was Hired to Create a Cash Management Division"***

22                a.    Plaintiff's Position & Evidence in Support

23       Plaintiff states that Defendant Callis told her that NIHFCU wanted to create a new Cash

24   Management Division to attract small and medium-sized businesses to NIHFCU.  Davis Depo. at

25   21-22.  Plaintiff has worked in and with "cash management" for over 20 years.  JSUF ¶ 24.

26   Plaintiff's entire career had involved the support and services of all the cash management

27   products.  JSUF ¶ 25; Davis Decl. ¶ 9.

28       Plaintiff understood from her discussions with Callis about building Cash Management

United States District Court
Northern District of California

6

1   Division that Callis wanted to move the credit union "up market," meaning expanding NIHFCU

2   from providing banking services for retail customers, i.e. individuals, to providing cash

3   management services to small and mid-sized businesses.  JSUF ¶ 28; Davis Depo. at 20.  Plaintiff

4   testified that in December 2010 and January 2011, Callis contacted her three to five times via

5   telephone and email about wanting to hire Plaintiff to "roll out" or "build" a cash management

6   division.  JSUF ¶ 37; Davis Depo. at 17:13.  Plaintiff testified that Callis said she had "a perfect

7   position" for Plaintiff and did not know anybody who could roll out a cash management division

8   as well as Plaintiff.  JSUF ¶ 38; Davis Depo. at 17:7-16.

9        Plaintiff states that all of her discussions with Callis were about creating the Cash

10   Management Division.  Davis Decl. ¶ 26.  Plaintiff presumed that NIHFCU already had some

11   products that could be used for cash management, such as ACH and wire transfer, and also

12   presumed that everything else would be brand new.  JSUF ¶ 30; Davis Depo. at 22:1-5.  Plaintiff

13   expected from her conversations with Callis that she would build a dedicated service center for

14   cash management, but on a much smaller scale than the larger financial institutions.  JSUF ¶ 30.

15        Plaintiff testified that Defendant Callis told her that in addition to creating a new Cash

16   Management Division, Plaintiff would also supervise the accounting department and perform

17   account operations duties.  Davis Depo. at 47-48.  However, Plaintiff states that all of her

18   conversations with Callis regarding her position at NIHFCU concerned the cash management

19   division.  Davis Decl. ¶ 26.  Plaintiff did not recall ever discussing the details regarding what

20   services were included in the account operations department.  Davis Depo. at 47:20.  Plaintiff was

21   never told that her primary role at NIHFCU would be to manage account operations.  Davis Decl.

22   ¶ 26.

23        Plaintiff states that within a week of working at NIHFCU, Callis told her NIHFCU would

24   not be going forward with the creation of a Cash Management Division.  JUSF ¶ 68; Davis Depo.

25   at 147; Davis Decl. ¶ 24.  Plaintiff was not given any assignments or products related to the

26   creation of the Cash Management Division.  *Id.* ¶ 23.  According to Plaintiff, this news was

27   shocking as she had understood that she had been hired to build the Cash Management Division.

28   Plaintiff states that she was at loss for why she had been hired in the first place.  *Id.*

United States District Court
Northern District of California

Without the task of creating the new Cash Management Division, Plaintiff states that she did not have enough work to fill her days. Davis Decl. ¶ 28. Plaintiff spent four and a half months finding ways to automate and re-engineer processes. *Id*. ¶ 27. Plaintiff initiated proposals to increase revenue and reduce costs, and set up meetings with vendors to discuss new systems to update the antiquated NIHFCU systems. *Id*. Plaintiff was given one person to supervise. *Id*.

Although Plaintiff is familiar with most functions of account operations at financial institutions, she does not have a background in working in that area, and it is not where her interests lie. Davis Decl. ¶ 25. Plaintiff states that she was not informed that supervising account operations would be her primary roll at NIHFCU, and that she would not have moved to Maryland had she known that she would have just been managing account operations. *Id*. ¶ 26.

It is undisputed that at the time Defendant Callis offered Plaintiff the position of Vice President of Cash Management and Account Operations, Defendant Callis knew that NIHFCU had not formalized the cash management services NIHFCU intended to provide. JSUF ¶ 72. In fact, the entirety of Callis's deposition testimony implies that Callis has a very different understanding of the phrase "cash management" than Plaintiff. As discussed in the next section, Callis's testimony is even inconsistent with Duvall's declaration, as Duvall wrote that when Plaintiff was hired, NIHFCU intended to make the creation of Cash Management Division a priority.

Callis testified that that she refers to "cash management" as a "function" and "verb" as opposed to a division, and further testified that NIHFCU had "cash management" before Callis even became the CEO in 2009:

> Cash management was a subset in accounting. Including wires, ACHs, check clearing, cash management of all the ATMs and debit cards, numerous reconciliations. It was not entitled "cash management," but it managed the cash of the organization.

Callis Depo. at 21:21-25. Callis testified that "[a]ll those functions were in a department that was called account operations or accounting operations. It was just not dubbed the fancier term 'cash management.'" *Id*. at 22:8-10. Callis testified, "I can answer you honestly and accurately the cash management function preceded my term by a very significant period of time and continued and continues to this day with its core functions of reconciliations and cash management – as a verb –

1  of the financial institution called NIHFCU." *Id*. at 25:10-15.

2        Callis testified that the position offered to Plaintiff was in "account operations," which was

3  the position left open by Shampa.  JSUF ¶ 80; Callis Depo. at 43:24 - 44:1.  Callis testified that the

4  position offered to Plaintiff had more responsibility, as Shampa had not held the "Vice President"

5  title.  Callis Depo. at 52.  Callis also testified, however, that she did *not* tell Plaintiff she wanted

6  her to create a Cash Management Division because cash management is a "function" and was

7  already "in place":

8        Q: Did you have conversations with Ms. Davis about telling her that
         you wanted to hire her to grow cash a cash management division at
9        the credit union NIHFCU?

10       A: A specific conversation that said "grow cash management," no,
         because cash management was in place.  Yes to additional services
11       being added.[3]  But remember, cash management and account
         operations is a functions.  Was and is.  That hasn't changed.
12

13  Callis Depo. at 46:4-11.

14       Q: So is it your testimony that there was no plan to build a cash
         management division when Ms. Davis was hired for the vice
15       president and account operations?

16       A:  Cash management function was in the credit union preceding
         Ms. Davis, during her term there, and subsequent to Ms. Davis.  It's
17       a function.  It's performance of managing the cash transactions of
         the organization and reconciling those.  It's a daily account
18       operations, accounting operations function.
19

20  Callis Depo at 52:9-24.

21       In addition to the dispute about what Callis said prior to Plaintiff's acceptance of the

22  position, there is also a dispute about what Callis told Plaintiff after she started working for

23  NIHFCU in Maryland.  Plaintiff testified that, within one week of starting at NIHFCU, Callis told

24  her that there was no plan for a Cash Management Division.  Davis Decl. ¶ 24.  Defendants

25  dispute that Callis ever told this to Plaintiff.  At her deposition, Callis testified:

26

27        [3] When asked what additional services were being added, Callis answered "international
28  remittance," which is the service Plaintiff had installed in July 2010 prior to her offer and
    acceptance of the permanent position.  Callis Depo. at 52; JSUF ¶¶ 13-14.

1

> Q: Shortly after Ms. Davis started, you informed her that there was not going to be a cash management division.  Is that true?

2

> A: That is absolutely not true.

3

4

> Q: Did you change Ms. Davis's responsibilities from those that were represented to her when she was hired shortly after she came on board?

5

> A: Absolutely not.

6

7

Callis Depo. at 78:23 – 19:5.

8

Plaintiff states that the circumstances surrounding her termination constitute further

9

evidence that NIHFCU never intended for Plaintiff to build a Cash Management Division.

10

Plaintiff believes she was hired to fill the position left open by Shampa and manage account

11

operations, as well as to upgrade NIHFCU systems.  Plaintiff believes that she was terminated

12

once those tasks had been accomplished.

13

When Duvall called Plaintiff into his office on July 15, 2011, he told Plaintiff that she was

14

being terminated for reasons that Plaintiff does not believe were her responsibility.  Duvall told

15

Plaintiff that she was terminated because she did not know the DDA systems was posting entries

16

incorrectly, and because she allegedly failed to write a procedure she was tasked with.  *Id*. ¶ 124.

17

In response, Plaintiff told Duvall that the DDA systems was an IT problem and she was not

18

responsible for IT, and that she had never been asked to write a procedure.  *Id*. ¶ 133.

19

Duvall prepared a memorandum titled, "Vice President of Account Services Failure to

20

Perform," which allegedly documents Plaintiff's poor performance.  JSUF ¶ 121; *see also* Duvall

21

Decl., Ex. E.  It is undisputed that Plaintiff was not shown or given this document.  *Id*. ¶ 123.

22

Notably, the title of this document refers to the position of "Vice President Account Services," not

23

the "Vice President *Cash Management* and Account Operations."  JSUF ¶ 122 (emphasis added);

24

Callis Depo., Ex. D.

25

Moreover, Plaintiff notes that NIHFCU has a progressive discipline policy which was not

26

applied in her case.  JSUF ¶¶ 125-26.  NIHFCU's "Discipline and Separation Procedures" state in

27

28

United States District Court
Northern District of California

1    relevant part: "For other than major infractions,⁴ which can result in immediate termination;

2    normally you will first be counseled verbally about the problem with the intent of clearing up any

3    misunderstanding and established expected behavior in the future." *Id.* ¶ 127.  The exceptions to

4    the progressive discipline policy state that immediate dismissal could result without prior warning

5    of suspension "in the case of *significant acts of misconduct or serious dereliction of duty* as

6    determined by the credit union in its sole discretion." *Id.* ¶ 129 (emphasis added).

7        Plaintiff was not accused of any "significant acts of misconduct or serious dereliction of

8    duty" as grounds for her termination. *Id.* ¶ 130.  Plaintiff testified that she was never verbally

9    counseled or warned about any deficiencies in her performance prior to her termination from

10   NIHFCU.  *Id.* ¶ 131.  Plaintiff denies that she performed deficiently as claimed by NIHFCU and

11   contends that, on the contrary, everything she had heard was how happy they were with all the

12   automation and process improvements she had implemented.  *Id.* ¶ 132.

13                 b.    *Defendants' Contentions & Evidence in Support*

14       Defendants' contentions regarding Callis's representations to Plaintiff are inconsistent with

15   Callis's testimony.   Callis testified that she never told Plaintiff she was hired to "grow cash

16   management" because cash management is a "function" which has always existed at NIHFCU.

17   Callis Depo. at 46.  In their Motion, Defendants argue that Callis indeed told Plaintiff that she

18   would be hired to build a "Cash Management Division," as that was the plan in February 2011

19   when Plaintiff was hired.  Defendants contend, however, that this statement was not false when

20   made, as it was only decided *after* Plaintiff started working at NIHFCU that the creation of a Cash

21   Management Division was not a priority for NIHFCU.

22       In support of this position, Defendants submit a declaration authored by Tim Duvall.

23   Declaration of Tim Duvall in Support of Defendants' Motion for Summary Judgment ("Duvall

24

25 _____

26       ⁴ NIHFCU's "Discipline and Separation Procedures" define "major infractions" as
    including a breach of confidentiality, failure to comply with employment procedures and
27   directives, failure to comply with credit union policies and procedures, misuse or misappropriation
    of Credit Union funds, poor attendance and punctuality, failure to comply with Credit Union dress
28   code, and inappropriate or unprofessional workplace conduct.  JSUF ¶ 128.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Decl."). According to Duvall, NIHFCU had the intention in February 2011 to create a Cash

2   Management Division. Duvall Decl. ¶ 9. Duvall states that it was decided only *after* March 1,

3   2011—*after* Plaintiff started working at NIHFCU—that the Cash Management Division would not

4   be a primary focus for NIHFCU in 2011. *Id.* ¶¶ 8-9. Duvall explains that prior to March 1, 2011,

5   NIHFCU was in a growth mode and initially believed the Cash Management Division to be a good

6   business fit. *Id.* However, because of the economy, members and businesses were holding on to

7   cash, and deposits grew faster than NIHFCU was able to generate suitable portfolio loans. *Id.*

8   Thus, after March 1, 2011, NIHFCU simply decided not to make its Cash Management Division a

9   priority. *Id.* According to Duvall, even after the Cash Management Division was not a priority,

10  NIHFCU still intended to have the Cash Management Division developed. *Id.* ¶ 10.

11          To corroborate Duvall's declaration, Defendants submit two organizational charts

12  purportedly created on February 1, 2011 which list Cash Management as a separate department

13  under Accounting/Finance. JUSF ¶ 41; *see also* Duvall Decl. ¶ 4; Supplemental Declaration of

14  Tim Duvall in Support of Defendants' Motion for Summary Judgment ¶ 3; Reid Decl., Ex. 3

15  (organizational charts).

16          In addition, Defendants cite that emails Plaintiff sent during her time at NIHFCU. On

17  March 4, 2011, Plaintiff sent an email to an individual who worked at BNY Mellon and wrote, "I

18  need to build a cash management division and have a list of core products we'll need to have to

19  start." Brown Decl., Ex. F. On May 23, 2011, Plaintiff wrote an email to Capital One Bank to

20  inquire whether it worked with other smaller financial institutions to provide outsourced product.

21  Brown Decl., Ex. M. In the email, Plaintiff wrote: "I run Cash Management at NIHFCU and we

22  are interested in building up our cash management product set to bank small to mid size

23  businesses." *Id.*

24          Plaintiff also sent emails to employees of NIHFCU referencing the creation of the Cash

25  Management Division. On June 24, 2011, Plaintiff wrote to the E-Commerce Manager for

26  NIHFCU and stated: "Laura, confirm with them about what platform they allow ACH batch files

27  to be sent … I'll need to know that as well as we start to build out our Cash Management suite of

28  products…." Brown Decl., Ex. N. On July 8, 2011, Plaintiff emailed Callis, Duvall and other

12

NIHFCU employees and stated that the group had been invited to "three product presentations on Wire Transfer Automation."  Brown Decl., Ex. O.  Plaintiff wrote, "if NIHFCU is serious about moving up-market to bank small to mid-size businesses, we are going to have to have a product that competes with commercial banks."  *Id*.  Plaintiff testified that in writing these emails, she was attempting to drop hints about what NIHFCU would really need if it wanted to provide cash management services.  Davis Depo. at 147.

Defendants also contend that Plaintiff was responsible for crafting her job description prior to her receiving an offer from NIHFCU.  JSUF ¶ 60.  The metadata of NIHFCU's business document shows that on January 20, 2011, Plaintiff drafted a job description for "Vice President Cash Management and Account Operations" at NIHFCU, and that Callis edited the job description the following day.  Declaration of Radu Marin in Support of Defendants' Motion for Summary Judgment ("Marin Decl.") ¶ 6.  Plaintiff disputes the allegation that she had any involvement in the crafting of her job description.

### 2.    *"Callis would be Plaintiff's Supervisor"*

Plaintiff testified that it was her understanding that only Callis would be her supervisor.  Davis Depo. at 42: 16-24.  As evidence in support of this proposition, Plaintiff points to the offer letter she signed on February 28, 2011 which stated, "Juli Anne Callis will be your supervisor."  JSUF ¶ 47; *see also* Brown Decl., Ex. G.

Plaintiff contends that when she arrived at NIHFCU, Callis "wouldn't talk to [her]" and they "had very, very infrequent conversations…."  Davis Depo. at 140.  Plaintiff states that approximately three months after Plaintiff started working at NIHFCU, Callis emailed her to inform her that Plaintiff no longer reported to Callis and that Plaintiff would now report to Duvall.  JSUF ¶ 113; Davis Depo. at 42.  Defendants dispute this.  At her deposition, Callis denied ever having ever removed herself as Plaintiff's direct supervisor:

> Q: At some point in time, you removed yourself from Ms. Davis's direct supervision.  Is that correct?
>
> A: That is not correct.

Callis Depo. at 79:11-22.

1    Defendants contend that prior to accepting the position at NIHFCU, Plaintiff had been

2  informed that *both* Callis and Duvall would be her supervisors.  Defendants contend that Callis

3  sent an email to Plaintiff on February 8, 2011, a few hours after Plaintiff was sent the offer letter

4  by email, which stated: "Please remember as with all members of the team Tim Duvall is stepping

5  in as EVP Deputy CEO and therefore will serve in tandem with me as your supervisor."  JSUF ¶

6  55; *see also* Brown Decl., Ex. H.  Plaintiff did not recall receiving this email.  Davis Depo. at 42.

7  Defendants also note that Plaintiff's job description states that she will "work[] directly with the

8  CEO and Deputy CEO."  Brown Decl., Ex. I.  Plaintiff testified that Duvall did not supervise her

9  work, and that she did not perceive Duvall to be her supervisor.  *Id.*

10    Plaintiff contends that Defendant Callis's representation that Plaintiff would be working

11  directly for her was one of the primary reasons Plaintiff agreed to relocate to Maryland for the

12  position and that she would never have moved to Maryland to work for someone she did not

13  know.  JSUF ¶ 51.  Defendant Callis was the wife of a pastor, and Plaintiff contends that the ties to

14  the Christian community were a key reason why Plaintiff trusted Callis and felt that she could rely

15  on her representations in deciding whether to move to Maryland.  *Id.* ¶ 52.

16         **3.    *"Plaintiff's Employment would be Long Term"***

17    The third knowingly false representation that Plaintiff seeks to prove is that Callis told

18  Plaintiff she was being hired for long term employment.  Plaintiff writes in her declaration that she

19  was told that she "was being hired for long term, permanent employment."  Davis Decl. ¶ 18.

20  Plaintiff also testified that when Callis originally started talking to Plaintiff, Callis said that it

21  would take a "minimum of one year" to create the Cash Management Division.  JSUF ¶ 44; Davis

22  Depo. at 113:13-14.  Plaintiff assumed that after one year she would continue with NIHFCU and

23  run the Cash Management Division as a long-term employee.  *Id.* at 116:15-16.  Plaintiff testified

24  that she "signed a 12-month lease because [she] thought it was a long-term position."  *Id.* at 58.

25    Defendants contend that Plaintiff was never informed that her position would be long-term

26  or permanent, and the evidence of record compels a conclusion that Plaintiff was told the contrary.

27  Defendants note that Plaintiff signed an application for employment on February 3, 2011 around

28  the time of her interview.  *See* Duval Decl. ¶ 5.  As part of this application, Davis signed an

"Applicant Statement," which states, in relevant part:

> *If I am hired*, I understand that I am free to resign at any time, with or without cause and with or without prior notice, *and NIHFCU reserves the same right to terminate my employment at any time, with or without prior notice*, except as may be required by law. This application does not constitute an agreement or contract for employment for any specified period or definite duration. I understand that no supervisor or representative of NIHFCU is authorized to make any assurances to the contrary and that no implied oral or written agreement contrary to the foregoing express language are valid unless they are in writing and signed by NIHFCU's president.

JSUF ¶ 53; Duvall Decl., Ex. D (emphasis added). Defendants also point to the offer letter which Plaintiff signed on February 28, 2011, which states: "[T]his letter or its contents are not intended to be and should not be construed as being a contract for employment under any terms or conditions." JSUF ¶ 54; Brown Decl., Ex. G.

Defendants also cite an email chain sent between Plaintiff and Stephen McGowan, the Chief Administrative Officer of NIHFCU. *See* Brown Decl., Ex. C. After Plaintiff received an offer from NIHFCU on February 8, 2011, she sent an email to Callis and McGowan to formally accept the position. The last paragraph of that email reads as follows:

> Juli Anne, we discussed this once, but I wanted to ask you again given what happened to me at Keypoint Credit Union in Santa Clara, California. As you may imagine, it left a bitter taste in my mouth. At Keypoint, I quit a job to come work there, and was then laid off after two months for reasons that had nothing to do with my performance. Given I only had 2 months with the Credit Union, I was eligible for no severance and was kicked out to the street with nothing to help me get started. I do not think the same thing is going to happen at NIHFCU. *But to give me some peace of mind, I would like to request a guaranteed severance package in the event something unexpected happens again and I am once again without a job in a very troubled economic market.* Thank you for understanding.

Brown Decl., Ex. C (emphasis added). In response to this email, McGowan wrote to Plaintiff:

> We have a corporate wide severance package. If we terminate a position without cause we pay four weeks pay in lieu of notice and one week for each year worked with a minimum of three weeks. Your first 3 years you would be guaranteed 7 weeks pay.

*Id.*

United States District Court
Northern District of California

15

United States District Court
Northern District of California

### III.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

### IV.     DISCUSSION

#### A.     California Labor Code § 970

Plaintiff's one cause of action arises under California Labor Code § 970, which prohibits knowingly false statements made in order to induce or persuade someone to change their residence. Cal. Labor Code § 970. The statute provides in pertinent part:

> No person, or agent or officer thereof, directly or indirectly, shall *influence, persuade, or engage any person to change … from any place within the State to any place outside,* for the purpose of working in any branch of labor, through or by means of *knowingly false representations*, whether spoken, written, or advertised in printed form, concerning either:
>
> (a) The kind, character, or existence of such work;
>
> (b) The length of time such work will last, or the compensation therefor[.]

Cal. Lab. Code § 970 (emphasis added). The statute "was enacted to protect migrant workers from the abuses heaped upon them by unscrupulous employers and potential employers, especially involving false promises made to induce migrant workers to move in the first instance." *Tyco Indus., Inc. v. Superior Court*, 164 Cal.App.3d 148, 155 (1985); *see also Fittante v. Palm Springs Motors, Inc.*, 105 Cal.App.4th 708, 718 (2003). Section 970 "has a public purpose: to protect the

16

1    community from the harm inflicted when a fraudulently induced employment ceases and the

2    former employee is left in the community without roots or resources and becomes a charge on the

3    community." *Mercuro v. Superior Court*, 96 Cal.App.4th 167, 180 (2002).

4         A claim under section 970 is similar to a claim for fraud.  To prevail on this claim at trial,

5    Plaintiff must prove that: (1) Callis made one or more statements concerning the "kind, character

6    or existence" of employment at NIHFCU or the "length of time" that such work would last; (3)

7    one or more statements was false; (4) Callis knew that one or more statements was false when

8    made; (5) Callis intended Plaintiff to rely on her statements; (6) Plaintiff reasonably relied on such

9    statements; (7) Plaintiff was harmed; and (8) Plaintiff's reliance was a substantial factor in causing

10   her harm.  *See* Judicial Council of California Civil Jury Instruction 2710.

11        Plaintiff may use circumstantial evidence to establish the "intent" element of her section

12   970 claim.  *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30 (1985).  "[F]raudulent intent has been

13   inferred from such circumstances as defendant's insolvency, his hasty repudiation of the promise,

14   his failure even to attempt performance, or his continued assurances after it was clear he would not

15   perform."  *Id*. (citing Prosser, Torts (5th ed. 1984) § 109, p. 764).  However, "something more

16   than nonperformance is required to prove the defendant's intent not to perform his promise."

17   *Tenzer*, 39 Cal.3d at 30 (quoting *People v. Ashley*, 42 Cal.2d 246, 263 (1954)).  "[I]f plaintiff

18   adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise,

19   he will never reach a jury."  *Tenzer*, 39 Cal.3d at 31.

20        **B.     Analysis**

21        As noted above, Plaintiff contends that Callis knowingly made three false statements: (1)

22   that Callis was bringing Plaintiff to Maryland to build a cash management division for NIHFCU;

23   (2) that Callis would be Plaintiff's manager and Plaintiff would report to Callis; and (3) Plaintiff's

24   employment would be a "long-term permanent job."  JSUF ¶ 134.  For the following reasons, the

25   Court denies Defendants Motion with respect to the first misrepresentation, and grants

26   Defendants' Motion with respect to the second and third misrepresentations.

27   //

28   //

United States District Court
Northern District of California

17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

1.      **Alleged Misrepresentation #1:** *"Plaintiff was Hired to Build a Cash Management Division"*

Defendants do not dispute that Callis told Plaintiff that she was hired to build a Cash Management Division.[5]  Plaintiff testified that all of her conversations with Callis were about creating the Cash Management Division.  The job description also corroborates Plaintiff's testimony, as it explicitly provides that Plaintiff's position "[i]nvolves creating a new Cash Management Division and upgrading and modifying the existing Account Operations Division." JSUF ¶ 61; Brown Decl., Ex. I.

First, Defendants argue that Plaintiff was aware that she would manage *both* cash management *and account operations*.  Defendants contend that the fact Plaintiff assisted in the drafting of her job description proves that she was aware of her account operations responsibilities.  Nevertheless, whether Plaintiff was aware that she would manage account operations is irrelevant to whether Callis lied when she said Plaintiff was hired to build a Cash Management Division.  As Plaintiff points out, Defendants have not cited any authority for the proposition that an employer is not liable under § 970 when only part of a job is misrepresented. Plaintiff's § 970 claim depends only on whether Callis knowingly and falsely told Plaintiff that she was hired to build a *Cash Management Division*.

Defendants also argue that NIHFCU never decided *not* to build a Cash Management Division.  According to Duvall's declaration, even when NIHFCU decided that the creation of a Cash Management Division was no longer a priority, NIHFCU still intended to build the Cash Management Division.  *See* Duvall Decl. ¶ 10.  This evidence, however, is disputed by Plaintiff's testimony.  Plaintiff testified that within a week of working at NIHFCU, Callis informed her that NIHFCU was not going forward with building a new Cash Management Division.  JSUF ¶ 68.

Defendants contend that at the time Callis told Plaintiff that she was hired to build a Cash Management Division at NIHFCU, Callis did not know that statement was false.  Defendants state that in February 2011, NIHFCU had a plan to build a Cash Management Division, and that was

---

[5] This is, however, contrary to Callis's deposition testimony.  *See* Callis Depo. at 46.

the reason Plaintiff was hired.  Duvall Decl. ¶ 9.  Duvall writes in his declaration that only after March 1, 2011, after Plaintiff started working at NIHFCU, did NIHFCU decide that the Cash Management Division would not be a primary focus for NIHFCU.  *Id.*  Duvall explains NIHFCU shifted its focus sometime after Plaintiff's second day of work because members began making depositions faster than NIHFCU was able to generate suitable portfolio loans.  *Id.*

If NIHFCU in fact planned to implement the Cash Management Division in February 2011, then there is strong circumstantial evidence that *when* Callis told Plaintiff she would build a Cash Management Division, she believed this statement to be true.  Plaintiff states, however, that NIHFCU never had a plan to build a Cash Management Division and Duvall's explanation is pretext.  To rebut Duvall's declaration and establish Callis's fraudulent intent, Plaintiff must present some evidence that Callis knew this statement was false when it was made.  The fact Plaintiff never did build the Cash Management Division is insufficient.  *Tenzer*, 39 Cal.3d at 31 (plaintiff must submit more evidence than mere "nonperformance of an oral promise").

The Court finds that Plaintiff submitted sufficient circumstantial evidence to establish a genuine issue of material fact as to whether Callis knowingly lied when she said Plaintiff was hired to build a Cash Management Division.  First, Callis's own testimony permits a reasonable inference of her fraudulent intent.  Contrary to the position Defendants take in their briefing, Callis flatly denies that she hired Plaintiff to "grow cash management."  Callis Depo. at 46, 52.  According to Callis, "cash management" is a "function" in account operations, and the fact it was already in place shows that Callis never asked Plaintiff to "grow cash management."  *Id.* at 46.  Callis's testimony contradicts Plaintiff's job description, which states that Plaintiff's position "[i]nvolves creating a new Cash Management Division and upgrading and modifying the existing Account Operations Division."  JSUF ¶ 61; Brown Decl., Ex. I.  Callis's testimony is also inconsistent Duvall's declaration, which states that at the time Plaintiff was hired, NIHFCU intended to create a Cash Management Division.  Duvall Decl. ¶ 9.

Plaintiff states that within a week of working at NIHFCU, Callis informed her that NIHFCU no longer had the intention to build a Cash Management Division. Davis Decl. ¶ 24; *see also Tenzer*, 39 Cal.3d at 30 (citing Prosser, Torts (5th ed. 1984) § 109, p. 764) ("[F]raudulent

United States District Court
Northern District of California

19

intent has been inferred from such circumstances as defendant's … hasty repudiation of the promise…."). While Callis denies ever having said this, Callis's entire testimony is undermined by the fact that she remembers a different version of events than both Duvall and Plaintiff. Moreover, Duvall's declaration only states that this decision was made sometime after Plaintiff was hired. *See* Duvall Decl. ¶ 9. This statement provides no insight as to who made the decision or when it was actually made. As Plaintiff points out, half-billion dollar financial institutions do not make decisions regarding their organizational divisions overnight. If Callis in fact told Plaintiff within the first week of starting at NIHFCU that they would not be creating a Cash Management Division, then there is further circumstantial evidence of Callis's fraudulent intent.

To rebut Plaintiff's testimony that Callis told her NIHFCU no longer had plans to create the Cash Management Division, Defendants note that Plaintiff sent emails to individuals both internal and external to NIHFCU in an attempt to promote the creation of the Cash Management Division. It is clear from the context of the emails, however, that Plaintiff was merely trying to promote the Cash Management Division. The emails do not show that Plaintiff had any support or encouragement from Callis or other NIHFCU management, and, in fact, imply the contrary. Moreover, the only email in which Callis actually states that she is "building" a Cash Management Division was sent on March 4, 2011, the first week of Plaintiff's employment at NIHFCU. Thus, it is not inconsistent with her testimony that within a week at being at NIHFCU, Plaintiff was informed that she would not build a Cash Management Division.

The lack of documentation showing NIHFCU's intention to create a Cash Management Division also provides circumstantial evidence permitting a reasonable inference of Callis's fraudulent intent. If NIHFCU intended to create a Cash Management Division in February 2011 and hired Plaintiff for that reason, the one would imagine the half-billion dollar credit union would have documents proving that intention. Defendants have not submitted any board proposals, emails, meeting minutes, or other documents that would be sufficient to corroborate Duvall's statement that NIHFCU's intended in February 2011 to create a Cash Management Division.

The only documents Defendants submitted to corroborate Duvall's declaration are two organizational charts purportedly created on February 1, 2011−around the time of Plaintiff's

20

interview—that list Cash Management as a separate department under Accounting/Finance.  JSUF ¶ 41; *see also* Duvall Decl. ¶ 4; Duvall Supp. Decl. ¶ 3; Reid Decl., Ex. 3 (organizational charts).  Even assuming the charts were created on February 1, 2011—which is disputed—this would not be sufficient to corroborate Duvall's declaration.  The charts themselves contain little information—they merely list "cash management" in separate boxes along with over twenty other banking function categories.  There is no evidence that these charts were ever used or were ever intended to be used.  The charts do not foreclose the possibility that NIHFCU never intended to create a Cash Management Division.

Finally, the way in which Plaintiff was terminated may be circumstantial evidence of Callis's fraudulent intent.  Plaintiff believes that she was only hired to fill Shampa's former roll managing account operations and to upgrade the systems at NIHFCU.  Plaintiff believes she was terminated once these tasks were accomplished.  Defendants have submitted a document purportedly listing the reasons why Plaintiff was terminated.  Duvall Decl., Ex. E.  Plaintiff was never given or shown this document.  JSUF ¶ 123.  Notably, the title of this document refers to the position of "Vice President Account Services," not the "Vice President *Cash Management* and Account Operations."  JSUF ¶ 122 (emphasis added).  Plaintiff also believes that Duvall's stated reasons for Plaintiff's termination are pretext—as she was not responsible for the IT problem identified by Duvall and was never asked to write the procedure that he suggests.  Also, despite the fact NIHFCU has a progressive discipline policy stating that an employee will first be counseled verbally, Plaintiff states that she was never informed of any deficiencies prior to her termination.  JSUF ¶¶ 125-26.

Accordingly, the Court finds that Plaintiff has submitted sufficient circumstantial evidence of Callis's fraudulent intent.  Because Defendants do not dispute the other elements of this claim, Plaintiff will survive summary judgment with respect to the alleged misrepresentation that Plaintiff was hired to build a Cash Management Division.

### 2.   Alleged Misrepresentation #2: *"Callis would be Plaintiff's Supervisor"*

The next issue is whether Callis knowingly misrepresented that she would be Plaintiff's supervisor.  It is undisputed that Callis told Plaintiff she would be her supervisor.  Indeed,

United States District Court
Northern District of California

1   Plaintiff's offer letter states that "Juli Anne Callis will be your supervisor."  JSUF ¶ 47.  It is also

2   undisputed that Plaintiff reported to Callis for three months−until the time in which Plaintiff states

3   Callis sent her an email informing her that she would report only to Duvall.

4          In light of these facts, Callis's statement that she would be Plaintiff's supervisor was not

5   false.  Plaintiff does not allege that Callis told her she would *always* be supervisor, and Callis *was*

6   Plaintiff's supervisor for the first three months of her employment.

7          Moreover, Defendants are entitled to summary judgment on this representation because

8   there is insufficient evidence to permit a reasonable inference that, when Callis said she would be

9   Plaintiff's supervisor, Callis knew that this statement was false.  In the previous section, the Court

10  reached the opposition conclusion with respect to the alleged representation that Plaintiff was

11  hired to build a Cash Management Division.  The Court noted Plaintiff's testimony that within the

12  *first week* of arriving at NIHFCU, Callis told her they would not be creating a Cash Management

13  Division.  With respect to this representation, however, Plaintiff states that *three months* passed

14  before Callis told her that she would stop reporting to Callis and start reporting to Duvall.  Unlike

15  the representation that Plaintiff would build a Cash Management Division, the representation that

16  Callis would be Plaintiff's supervisor was not repudiated so quickly.  In fact, the three months

17  during which Plaintiff reported to Callis negates the inference of fraudulent intent.

18         The only evidence Plaintiff offers in support of Callis's fraudulent intent is Plaintiff's

19  testimony that even during the first three months of her job, Callis did not communicate with her

20  or give her any assignments.  This evidence does not, however, change the undisputed fact that

21  Plaintiff reported directly to Callis.  During this time, Plaintiff sent Callis progress reports every

22  month.  The fact Callis was not a more engaged supervisor is insufficient to support an inference

23  that Callis lied when she said she would be Plaintiff's supervisor.   Accordingly, with respect to

24  the alleged misrepresentation that Callis would be Plaintiff's supervisor, Defendants are entitled to

25  summary judgment.

26         **3.      Alleged Misrepresentation #3: *"Plaintiff's Employment was Long Term"***

27         The last issue is whether Callis made a knowingly false statement that Plaintiff's

28  employment at NIHFCU would be a long-term, permanent job.  *See* JSUF ¶ 134.  Plaintiff writes

United States District Court
Northern District of California

22

in her declaration that Callis told her she "was being hired for long term, permanent employment."

Davis Decl. ¶ 3.  There is also evidence that "[w]hen [Callis] originally started talking to

[Plaintiff] about this opportunity," Callis told Plaintiff that it would take a "minimum of one year"

to build the Cash Management Division.  *See* Davis Depo. at 113.  Callis testified that the position

Plaintiff was hired for was anticipated to exist for the "foreseeable future."  JSUF ¶ 43.

Even if the foregoing permits an inference that Plaintiff was *told* she would be employed

long-term at NIHFCU, there is no evidence to suggest that Plaintiff *reasonably relied* on that

representation.  There is an abundance of evidence showing that Plaintiff was aware she was not

guaranteed a long term position.  On February 3, 2011, Plaintiff signed an application for

employment which states: "*If I am hired*, I understand that I am free to resign at any time, with or

without cause and with or without prior notice, *and NIHFCU reserves the same right to terminate

my employment at any time, with or without prior notice*, except as may be required by law."

JSUF ¶ 53; Duvall Decl. ¶ 5, Ex. D (emphasis added).  Plaintiff contends that the application for

employment "is not an agreement," but this is beside the point.  Plaintiff signed a document which

informed her that "if" she was hired, her employment would be at will.

Moreover, on February 8, 2011, Plaintiff sent an email to Callis and Stephen McGowan,

the Chief Administrative Officer of NIHFCU, in which she formally accepts the position and then

asks for a severance package in the event she is terminated within a short time of working at

NIHFCU.  *See* Brown Decl., Ex. C.  If Plaintiff had been told by Callis that she would be

employed long-term, and accepted the position in reliance of this statement, then it would be odd

to ask for a severance package when accepting the position.  Furthermore, McGowan's response to

Plaintiff's email informed Plaintiff that she *could* be terminated without cause, further foreclosing

the possibility that Plaintiff reasonably expected to be employed long term.  *See id.*

In *Dore v. Arnold Worldwide, Inc.*, 29 Cal.4h 384 (2006), the California Supreme Court

affirmed the trial court's grant of summary judgment in favor of an employer in a case where the

plaintiff alleged that he had been informed that he would be employed so long as he performed in

a competent manner, but also signed an "at will" employment contract.  *See id.* at 674.  Citing the

plaintiff's testimony that he understood the terms of his employment, the court held that the

United States District Court
Northern District of California

23

1    evidence showed that the plaintiff did *not rely* on the alleged false statements.  *Id.* at 393.  In this

2    case, the Court reaches the same conclusion: no reasonable jury could find that Plaintiff

3    reasonably relied on a representation that she would be employed long term when accepting the

4    position at NIHFCU.

5    **V.     CONCLUSION**

6         For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED in

7    part and DENIED in part.

8         **IT IS SO ORDERED**.

9    Dated: February 25, 2014

10

11                                              JOSEPH C. SPERO
                                                United States Magistrate Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28